C. Gilbert Taylor and Josephine M. Taylor v. Commissioner. C. Gilbert Taylor v. Commissioner.
Taylor v. Commissioner
Docket Nos. 38367, 38368.
United States Tax Court
T.C. Memo 1955-153; 1955 Tax Ct. Memo LEXIS 185; 14 T.C.M. (CCH) 563; T.C.M. (RIA) 55153; June 15, 1955
*185 1. In 1942, C. Gilbert Taylor and his father executed agreements establishing a partnership, Aircraft, to which they both contributed capital and services. Held, on the facts, petitioner and his father intended, in good faith, to join together for the present conduct of Aircraft's business as partners with an equal interest in Aircraft's profits. 2. In November 1943, C. Gilbert Taylor and his father conveyed a one-fourth interest in Aircraft to two of petitioner's children, and the four executed an agreement to carry on Aircraft's business as a partnership in which each had a one-fourth interest in Aircraft's earnings. In April 1944, the four, and a fifth person, Tepfer, executed an agreement establishing a second partnership, Airmetal, in which each was to have a one-fifth interest in the earnings. The capital contributions of the four Taylors were made with withdrawals from their Aircraft capital accounts. In July 1944, petitioner, his father, and his son, executed an agreement establishing a third partnership, Engineering, in which each was to have an equal interest. Withdrawals from their respective Aircraft capital accounts constituted their capital contributions to Engineering. *186 Petitioner's children performed no services for any of the partnerships. Petitioner, his father, and Tepfer, were credited with and withdrew sums from Airmetal which were not authorized by the partnership agreement. The assets of the partnerships were eventually transferred to a corporation in which the stock was distributed without regard to the undistributed earnings of each, petitioner receiving 25 per cent of the stock, although he had no interest in the partnerships' undistributed earnings, and the two children receiving only 10 per cent each, although their interest in the undistributed earnings exceeded 80 per cent. Held, on the facts, petitioner and his father and Tepfer, in the case of Airmetal, did not intend, in good faith, and with a business purpose to join with petitioner's children in the present conduct of the partnerships' business. Held, further, on the facts, the shares of income purportedly given to the children in the various partnership agreements are taxable equally to petitioner and his father. 3. Aircraft claimed deductions for additions to a bad debt reserve for 1943 and 1944 in amounts equal to 5 per cent and 3 per cent, respectively, of its year-end accounts *187 receivable. Held, on the facts, the amounts claimed were not reasonable additions to Aircraft's bad debt reserve and were properly disallowed by respondent. Albert B. Arbaugh, Esq., 1200 Harter Bank Building, Canton, Ohio, for the petitioners. William R. Bagby, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax for the years 1943, 1944, and 1945, as follows: Year
Deficiency
1943
$39,708.07
1944
13,490.38
1945
73,616.08
The year 1942 also is involved because of the provisions of the Current Tax Payment Act of 1943. The chief question to be decided is whether petitioner's father, son, and daughter were partners with petitioner from 1942 to 1945 in three partnerships, Aircraft Products Company, Airmetal Products Company, and Taylor Engineering Company. The Commissioner has determined that they were not copartners. A second question relates to whether respondent erred in disallowing deductions of $1,539.85 and $1,879.54 claimed by the Aircraft Products Company as additions to its bad debt reserve in 1943 and 1944, respectively. The petitioners *188 do not contest certain other adjustments made by the respondent. Findings of Fact C. Gilbert Taylor and Josephine M. Taylor, husband and wife, were residents of Alliance, Ohio, during the taxable years. Joint returns for 1944 and 1946 were filed. C. Gilbert Taylor filed individual returns for 1943 and 1945. All of the returns were filed with the collector for the eighteenth district of Ohio. Josephine is involved in these proceedings only because of the filing of the joint returns. C. Gilbert Taylor will be referred to hereinafter as the petitioner. The petitioner is an engineer. Prior to 1942 he organized the Taylorcraft Aviation Corporation, Alliance, Ohio, and served as its president. This corporation manufactured airplanes. In February 1942, petitioner resigned from this company and became a consulting engineer. He became associated as an engineering consultant with the Gibson Refrigerator Company of Greenville, Michigan (hereinafter referred to as Gibson Company), in connection with the latter's contract with the Government to build gliders. Petitioner also served, without salary, as the coordinator for nine companies producing CG4-A gliders for the armed forces. Petitioner's *189 father, Arthur Taylor, was 72 years old in 1942. He was an experienced machinist and tool and die maker, and prior to March 1942, had been in charge of tooling at the Taylorcraft Aviation Company. Arthur Taylor also resigned from the latter company in February 1942. Sometime in March 1942, petitioner and his father decided to establish a machine shop to produce war material. An undated partnership agreement executed by them sometime thereafter established a partnership under the name of Aircraft Products Co. (hereinafter referred to as Aircraft). The instrument provided that petitioner would pay 75 per cent of the costs incurred, and would hold a two-thirds interest in the enterprise. This agreement also provided "That all authority of management, policy, purchase, agreement, employment and discharge of personel, to be permanently vested in C. G. Taylor." Petitioner was given the right to delegate his authority for periods not in excess of six months. The agreement gave petitioner exclusive control over all the assets of the enterprise, and exclusive authority to sign all checks, drafts, and vouchers. Petitioner was given the right to purchase Arthur Taylor's interest at an appraised *190 value in the event Arthur Taylor became disabled or died. Arthur Taylor was not given any reciprocal right to purchase petitioner's interest. A bank account in the name of Aircraft was opened in March, 1942. On May 3, 1942, petitioner and Arthur Taylor executed an application to register Aircraft's name in Stark County, Ohio. The application named petitioner as Aircraft's "business manager and designated agent." Petitioner contributed $1,937.56 to Aircraft's capital between April 13 and November 1, 1942, and Arthur Taylor contributed $563.15 and some small tools. R. R. Vick, a public accountant hired by petitioner, set up books for Aircraft and opened capital accounts for petitioner and Arthur Taylor. Vick kept Aircraft's books, and was associated with petitioner's various enterprises until October, 1945. Petitioner had five children. The eldest, Robert, was 20 years old, and he was a student at the Case School of Applied Science, Cleveland, Ohio. He returned to Alliance on week ends. Petitioner's eldest daughter, Carol, was 17 and in her final year at high school. They were present during several discussions between petitioner and Arthur Taylor concerning Aircraft. Robert returned *191 to Alliance in May or June at the end of the school year, and at about the same time, Carol graduated from high school. The location chosen for Aircraft's operations was a brick garage approximately 26 x 28 feet in the rear of petitioner's home. In May 1942, Arthur Taylor and one of his grandsons, Howard Whelpton, began to set up equipment in the garage. The equipment consisted of light shaft machinery, three or four lathes, two or three drill presses, and a milling machine. The equipment was driven by a Model "A" Ford engine. Whelpton was Aircraft's first employee; he was hired by Arthur during a visit to Rochester, New York. Whelpton was 20 years old and had completed an advance machine shop course given at night at the Mechanics Institute in Rochester. Another relative, Addison, was Aircraft's second employee. As a result of his connection with the CG4-A glider program, petitioner secured subcontracts for Aircraft from seven of the nine contractors producing the gliders for the Government. Aircraft's subcontracts were for production of mitred gear boxes for the glider's trim-tab control. This device is used in connection with the elevation mechanism. Aircraft operated under *192 the subcontracts until the war ended, and also received subcontracts for the production of torque tube assemblies for the glider's elevator and rudder. Aircraft's principal function was to assemble parts received from suppliers. Aircraft's first employee outside the Taylor family, Alice Sims, started work in July, 1942. Aircraft did not begin to produce a finished product until about August 1, 1942. Petitioner's association with the Gibson Company and his other activities in connection with the CG4-A glider program kept him away from Alliance for approximately four days in each week after May 1942. Aircraft operated on a six-day, eight-hour basis, and during petitioner's absence, Arthur Taylor was in charge of production at the garage. Robert and Carol assisted in Aircraft's operations during the summer and on week ends in the spring and fall of 1942. Robert helped set up the machinery in the garage, and on occasion contacted sources of supply, assisted in the preparation of bids for subcontractors, expedited and coordinated work of the subcontractors, and sat in on week-end conferences between petitioner and Arthur. He also instructed new employees in the use of Aircraft's equipment. *193 At the time he returned to school in September 1942, Aircraft had seven employees. Carol attended to the telephone at her home and wrote letters, kept various records and performed other office work at an office which was set up in a den in petitioner's home. She was motivated by a desire to help her father. Robert and Carol Taylor were paid at least $282.72 and $110, respectively, by Aircraft in 1942. Robert returned to the Case School in September 1942, and Whelpton was made foreman of production. Robert continued to return to Alliance on week-ends. Carol Taylor entered college at Albion, Michigan, in September 1942, and was replaced by one Edna Anthony. She studied a home economics course, and thereafter did not perform any services for Aircraft; she did, however, discuss Aircraft's business during visits from petitioner and on the telephone. Petitioner paid the living and school expenses of both Robert and Carol Taylor in 1942. During 1942, petitioner and Arthur Taylor executed two additional agreements concerning Aircraft. The first, dated May 19, 1942, contains substantially the same terms as the undated agreement discussed above, except that petitioner's interest in the *194 enterprise was increased to three-fourths from two-thirds. A supplement to this agreement dated August 29, 1942, provided that if Aircraft's net earnings exceeded $6,000 per year, the profits would be distributed equally between petitioner and Arthur Taylor. This change in the distribution of earnings was to be in effect for two years, and was subject to "further agreement between the parties" thereafter in the event the war was still on. Arthur's share in the profits was increased primarily because he was devoting considerably more time to Aircraft than petitioner was, and also because he had contributed tools to Aircraft subsequent to their original agreement. On November 1, 1942, petitioner employed T. K. Broome to manage production at Aircraft. Broome and petitioner had met in 1936 and also had worked together for the Gibson Company. Broome was not in accord with many ideas on tooling and related matters held by Arthur Taylor, and had an understanding with petitioner that Arthur Taylor would have no part in production if Broome came to work for Aircraft. On November 14, 1942, Aircraft leased a building (hereinafter referred to as the Hillgreen factory), in Alliance, Ohio. The *195 lease describes Aircraft as a partnership composed of petitioner and Arthur. All Aircraft's operations were moved to the Hillgreen factory in November 1942. Broome was in charge of production at the Hillgreen factory. He hired and managed the personnel. He was directly under petitioner's supervision and all his contacts concerning Aircraft's operations were with petitioner. Petitioner signed all checks drawn by Aircraft. Howard Whelpton worked as a foreman at the factory under Broome. Arthur Taylor continued to work as a tool and die maker at the Hillgreen factory. He enjoyed good health in 1942 and was a vigorous and strong minded individual. He also visited Aircraft's bank approximately once each week on Aircraft's business, usually in the company of petitioner. Aircraft's net income for 1942 was $20,075.67, which was credited to the capital accounts of petitioner and Arthur Taylor in the amounts of $10,037.83 and $10,037.84, respectively. These amounts were also reported in their returns for 1942 as their respective distributive shares of Aircraft net income. Petitioner and Arthur Taylor intended, in good faith, to join together for the present conduct of Aircraft's business *196 as partners with an equal interest in Aircraft's profits. Robert Taylor entered the Army Air Force on February 26, 1943 and had little or no contact with Aircraft's activities during the remainder of the year. Carol Taylor returned to Alliance from college in May or June 1943, and had little or no contact with the Aircraft's operations. She was married on July 10, 1943. Her husband was in the Army Air Force and she thereafter travelled with him to Stanford, Kansas; Winfield, Kansas; Victoria, Texas; and Rantoul, Illinois. Aircraft continued to expand, and during 1943 employed a maximum of 70 employees. Petitioner was engaged as an engineering consultant by the Ridgefield Manufacturing Company, Ridgefield, New Jersey, in the middle of 1943 and served in that capacity until July of 1944. He terminated his relationship with the Gibson Company on October 1, 1943, but remained away from Alliance several days of each week in connection with his work for the Ridgefield Manufacturing Company. Arthur Taylor commenced signing checks for Aircraft on May 28, 1943, and continued to do tool and die making for Aircraft at the Hillgreen factory. Petitioner and Arthur filed declarations of estimated *197 tax on September 28, 1943, which disclosed estimated tax liabilities of $5,273.73 and $2,485.08, respectively. The declarations were prepared by R. R. Vick. No declarations were filed for Robert or for Carol. Sometime after July 10, 1943, and probably not before the latter part of November, 1943, petitioner executed a written assignment conveying a one-fourth interest in Aircraft and in all its assets to Robert and a similar interest to Carol. The instrument conveyed $4,662.94 of petitioner's capital account in Aircraft to Robert and $674.91 to Carol. Arthur Taylor also executed the document and conveyed $3,988.03 of his capital account to Carol. The instrument states that it was "Dated as of the first day of January, 1943," but referred to Carol by her married name, Carol Taylor Sharp. During the latter part of November, 1943, petitioner, Arthur, Robert, and Carol executed a partnership agreement for the conduct of Aircraft's business. Robert and Carol Taylor signed the agreement on about Thanksgiving Day, 1943, in Lafayette, Louisiana, during a visit by petitioner to Robert. Carol travelled to Lafayette from Victoria, Texas. On or after November 27, 1943, Aircraft filed a fictitious *198 name certificate, listing all four as partners, with the Clerk of the Court of Common Pleas of Stark County, Ohio. At about the same time, capital accounts were set up on Aircraft's books showing credit balances of $4,662.95 for petitioner and Arthur, and balances of $4,662.94 for Robert and Carol. These entries were dated January 1, 1943. In these documents and records, Carol was also referred to by her married name. On January 5, 1944, amended declarations of estimated tax were filed for petitioner and Arthur Taylor disclosing tax liabilities for 1943 in the amounts of $12,601.09 and $8,828.75, respectively. A declaration for Carol Taylor was filed on the same day and disclosed a liability of $6,885.16. Petitioner signed the three declarations, which had been prepared by R. R. Vick. No declaration was filed for Robert Taylor. Prior to the execution of the partnership articles in November, 1943, there had been no agreement between petitioner and Arthur, Robert, and Carol to carry on Aircraft's business as a partnership with Robert and Carol as partners. However, the document signed by the four Taylors claimed to represent a reduction to writing of an oral partnership agreement *199 which had been in effect "from and after January 1, 1943". The partnership agreement provided that petitioner was to receive a salary of between $4,800 and $20,000 per year, and Arthur Taylor a salary ranging from $3,000 to $5,000; payments above the minimum to either were subject to the approval of the other, but not to the approval of Robert or Carol. Each of the four Taylors was given a one-fourth interest in Aircraft's capital accounts and net earnings, which were to be computed after deducting the salaries paid to petitioner and Arthur Taylor. However, the distribution of any earnings to a partner was prohibited unless all the partners approved. Article Five of the agreement provided in part as follows: "* * * In view of the recognized experience of C. Gilbert Taylor in the industry, and his expert knowledge in the field of the Firm's business, it is expected that the other partners in the Firm will at all time [times] consult with C. Gilbert Taylor with reference to any activity in which they may be engaged for the Firm. In case of disagreement as to the making, taking or assuming any contract or obligation by the Firm, such contract or obligation shall not be made or entered *200 into." This provision was eliminated on February 24, 1945. On the same date, the provision relating to the approval of salary payments to petitioner and Arthur Taylor was amended to require that compensation in excess of the minimum would be subject to the approval of all partners. The partnership agreement required Robert and Carol Taylor to share their combined one-half interest equally with each of petitioner's other three children, Thelma May, Bonnie Jo. and Bruce Gilbert, as each of them reached the age of 21. Each child acquiring part of this one-half interest was to pay $1,000 to the children who already were partners, and by so doing, would become a partner. Article XV of the agreement provided as follows: "ARTICLE XV "It is agreed by and between the Original Partners, and any other children of C. Gilbert Taylor who may at any time be a partner in the Firm, that no interest in the Firm of any child of C. Gilbert Taylor, or in the capital account of the Firm, shall be subject to pledge, assignment, sale or transfer in any manner, without the written consent of all of the then partners, nor shall any such partners (a child of C. Gilbert Taylor) have power in any manner *201 to anticipate, charge or encumber his interest in the Firm or in its capital account, nor shall such interest in the Firm or in its capital account of such child be liable, or subjected to, in any manner, for the debts, contracts, liabilities, engagements or torts of such child. If at any time the interest of such child in the Firm or its capital account shall be seized or attached in any legal proceedings, or if by operation of law the interest of such child may be subjected to the claims of creditors of such child (or the claims of a legal representative of such creditors), then and in that event the then partnership shall terminate and be at an end, and a new partnership shall be deemed effected, consisting only of the remaining partners under the style and name of 'Aircraft Products Company', under and subject to the terms and provisions hereof; and such remaining partners shall thereupon pay to such child whose interest in the Firm is so affected, and such child agrees to accept, the sum of One Thousand Dollars ($1,000) in full payment for his interest in the Firm and his interest in its capital account, and such child shall have no further interest in the Firm nor in its assets *202 or capital account." * * * In the event of Arthur Taylor's death or disability, his interest was to be sold to petitioner for the sum of $1,000 plus the estate and inheritance taxes payable by reason of the inclusion for tax purposes of the interest in Arthur Taylor's estate. In the event of the death of Robert or Carol Taylor or of any of the petitioner's other children who had become partners, the interest of the deceased child was to be sold to the surviving children for a like amount. No restriction was placed upon the disposition of petitioner's interest in the event of his death. The Articles made no provision for the sharing of losses. However, on April 19, 1944, the agreement was modified to provide that losses would be borne in proportion to the partners' "* * * interest in the partnership and in proportion to their interest in the net profits of the partnership." The agreement was also modified on the same day to permit the children of petitioner who were partners to purchase Arthur Taylor's interest in the event petitioner predeceased Arthur. Other than the meeting in Lafayette, Louisiana, in November 1943, Carol did not meet other members of her family during *203 1943. She returned to Alliance for two weeks during January of 1944, and for three weeks during April of 1944. She was also visited by petitioner at Rantoul, Illinois, several times during 1944. During 1943 and 1944, she did not participate in the operation of Aircraft's business. Robert returned home on several passes in 1943 and for fifteen days commencing on or about April 15, 1944. He did not participate in the conduct of Aircraft's business in 1943 or 1944. Neither Robert nor Carol Taylor were authorized to sign checks on Aircraft's bank accounts. Aircraft reported net income of $78,037.87 for 1943 and $77,528.05 for 1944. Petitioner and Arthur Taylor received salaries of $4,800 and $3,900, respectively, in 1943, and $4,800 and $3,000 respectively in 1944. Aircraft's earnings for 1943 and 1944 were credited to the respective capital accounts and reported as the respective distributive shares of partnership net income as follows: Earnings Credited to
Distributive Share of
Capital Account
Earnings Reported
1943
1944
1943
1944
Petitioner
$17,334.46
$17,432.02
$22,134.46
$22,232.02
Arthur Taylor
17,334.47
17,432.01
21,234.47
20,432.01
Robert Taylor
17,334.47
17,432.01
17,334.47
17,432.01
Carol Taylor
17,334.47
17,432.01
17,334.47
17,432.01
*204 In 1944 petitioner became acquainted with John E. Tepfer, who was an expediter for Gibson Company at Wright Aeronautical Field, Dayton, Ohio. Tepfer was familiar with the parts required for aircraft production and was in a position to secure a prime contract for the production of a chaff dispenser, a device used to jam radar by dropping aluminum strips from an airplane. Petitioner agreed to produce the chaff dispenser. To satisfy Tepfer's demand for a share of the profits from the contract, petitioner organized a new partnership, Airmetal Products Company (hereinafter referred to as Airmetal) with Tepfer as one of the partners, to perform the contract. Airmetal's "Articles of Co-Partnership" were executed on April 19, 1944, by Tepfer, petitioner, Arthur, Robert, and Carol, as original partners. Carol had never met Tepfer before this occasion. Airmetal's capital of $10,000 was to be contributed equally by each of the original partners. Tepfer contributed $2,000 in cash to Airmetal; Aircraft issued four checks in the amount of $2,000 each, which were entered on Aircraft's books as withdrawals by petitioner, Arthur, Robert, and Carol. The agreement also provided that petitioner, Tepfer, *205 and Arthur Taylor each would receive compensation of $200 per month, but that no other distributions would be made except with the consent of all the partners. Robert and Carol were required, by a provision similar to that contained in the Aircraft Articles, to share their interests in Airmetal with any other of petitioner's children who became 21, upon the payment of $2,000. Arthur Taylor's interest, upon his death, was to be sold to petitioner, if alive, otherwise to petitioner's children who were then partners, for $2,000 plus estate and inheritance taxes; the interest of any deceased child was to be purchased for a similar price by the surviving children who were partners. By a provision similar to Article XV of the Aircraft agreement set forth above, Robert and Carol and petitioner's other children were prohibited from transferring or encumbering their interests in Airmetal without the written consent of all partners, and the interests of the children were subject to purchase by the other parties for $2,000 each, in the event of attachment or seizure. Airmetal occupied the main floor of the Hillgreen factory and produced chaff dispensers until August 1945. Most of the production *206 work was let out on subcontract and Airmetal acquired little equipment. Petitioner directed Airmetal's business operations and also directed the foremen and superintendents. A Mr. Eggeter was in charge of the plant operations under petitioner; Tepfer was in charge of sales and procurement; and Arthur Taylor handled the tooling problems. Robert Taylor was discharged from the service on September 17, 1945 and returned to the Case school from the fall of 1945 until his graduation in 1947. He took no part in the conduct of Airmetal's operations in the year ended April 30, 1945 and did not contribute any substantial services to Airmetal after his discharge and return to school. A child was born to Carol on January 20, 1945. She returned to Alliance in September or October 1945, but took no part in the conduct of Airmetal's operation. Only petitioner and Arthur Taylor were authorized to sign checks for Airmetal. Airmetal's books contained capital accounts for Tepfer, petitioner, Arthur, Robert and Carol which reflected initial contributions of $2,000 each. Tepfer's interest in Airmetal was purchased on February 1, 1946. The returns filed by Airmetal for the years ending April 30, 1945, and *207 February 1, 1946 disclose the following net income and distributive shares of income: 4/30/45
2/1/46
C. Gilbert Taylor
$ 40,923.47
$5,944.35
Arthur Taylor
25,923.48
844.36
Robert H. Taylor
16,923.48
(2,322.28)
Carol Sharp
16,923.48
(2,322.28)
John R. Tepfer
40,923.47
5,677.71
Net income
$141,617.38
$7,821.86 The distributive amounts disclosed by Airmetal's return were reported as income by petitioner, Arthur, Robert, and Carol in their respective returns. The petitioner and Arthur and Robert Taylor executed an agreement as of July 1, 1944, forming a third partnership under the name of The Taylor Engineering Company (hereinafter referred to as Engineering). Engineering was formed to carry on a general engineering, management and manufacturing business. The agreement specifi5d that each of the three partners would have an equal interest in the enterprise. The initial capital of $1,500 was provided by the withdrawal of $500 from the Aircraft capital account of each and the payment of the amounts withdrawn to Engineering. The agreement provided that petitioner was to receive a salary of $4,800 per year and Arthur Taylor of $3,000 per year, but *208 that no other distribution would be made without the consent of all partners. Petitioner or Robert, if petitioner had died, was given the right to purchase Arthur Taylor's interest for $2,000 plus estate taxes upon Arthur's death. Petitioner had the right to purchase Robert's interest for a similar amount in the event of the latter's death. No provision was made for the purchase by Robert or Arthur of petitioner's interest in the event petitioner died. The idea of forming Engineering was conceived by Vick, the accountant for petitioner's various enterprises. In the years ending June 30, 1945 and 1946, the only customers to which Engineering rendered any engineering or accounting services were Aircraft and Airmetal. The accounting work done by Engineering was performed under Vick's supervision. Engineering's returns for these years list Robert as "Army" and "student", respectively, and report that he devoted no part of his time to the business. Robert was paid no salary in either year, performed no services, and did not participate in the operations of Engineering. The partnership returns filed by Engineering for these years disclose the following distributive shares of net income. *209 6-30-45
6-30-46
C. Gilbert Taylor
$ 6,987.08
$ (111.66)
Arthur Taylor
5,187.08
(1,036.64)
Robert H. Taylor
2,187.08
(1,408.99)
Total income
$14,361.24
($2,557.29) These amounts were reported by petitioner, Arthur, and Robert, in their respective returns. The amounts reflect salaries paid to petitioner and Arthur Taylor of $4,800 and $3,000, respectively, in 1945, and $1,297.33 and $372.35, respectively, for 1946. Petitioner caused The Formetal Company (hereinafter referred to as Formetal), to be organized in November or December 1945. Airmetal discontinued operations on November 30, 1945, and on December 1, 1945, transferred machinery and equipment with a cost of $25,504.33 to Formetal, receiving Formetal's total initial issue of 215 shares of no-par capital stock in exchange. The stock was issued to petitioner as trustee for Airmetal, pending completion of arrangements to purchase Tepfer's interest in Airmetal. By an instrument dated February 1, 1946, Tepfer conveyed his interests in Airmetal and Formetal to petitioner, Arthur, Robert, and Carol. The balance of Airmetal's equipment, with a cost of $2,901.28, was transferred to Formetal between February *210 1 and April 30, 1946. During 1946, Aircraft disposed of its depreciable equipment and inventory. Assets with a cost of $31,976.18 were transferred to Formetal; equipment with a cost of $8,841.59 was scrapped or abandoned; and equipment with a cost of $4,855.66 was sold. The 215 shares of Formetal stock held by petitioner as trustee for Airmetal were distributed on June 1, 1946, as follows: petitioner received 48 shares, the other three Taylors 47 shares each, and the remaining 26 shares, plus 35 newly-issued shares, or a total of 61, were transferred to Aircraft. The entire 250 shares were redistributed five months later, on November 1, 1946, as follows: Petitioner, 63 shares; Arthur Taylor, 62 shares; Robert, Carol, Thelma, Bonnie, and Bruce Taylor, petitioner's children, 25 shares each. Aircraft remained in existence throughout 1946. On December 31, 1946, its remaining assets consisted of cash and receivables in the sum of $22,221.06. The net worth of the enterprise equalled $19,231.95, and was credited on Aircraft's books as follows: Petitioner
[1,300.49)
Arthur Taylor
7,722.19
Robert Taylor
6,543.66
Carol Sharp
6,266.59
Engineering continued in existence *211 throughout the fiscal year ending June 30, 1946, and reported that it held machinery, equipment, furniture, and fixtures on June 30, 1946, with a cost of $8,847.96. The name of Formetal subsequently was changed to Taylor Corporation. The Taylor Corporation is located in Alliance, Ohio, and is engaged in the manufacture of a small apartmenttype washing machine. On October 28, 1949, three of Arthur Taylor's shares were transferred to Robert Taylor. Petitioner, Robert, and Carol are the officers and directors of the Taylor Corporation. Arthur Taylor died in Florida in 1951 at the age of 81. The partnership agreements of Aircraft, Airmetal, and Engineering provided that no distributions other than the specified salaries would be made to any partner without the approval of all other partners. Robert and Carol Taylor did not receive any withdrawals from Airmetal or Engineering for their personal use. Petitioner, Arthur, and Tepfer were entitled to compensation of $200 per month from Airmetal. Nevertheless, from December 1944, to August, 1945, they received special credits to their respective capital accounts of $32,000, $12,000, and $32,000, respectively, and then withdrew these amounts *212 from the enterprise. Robert and Carol did not receive any similar credits or withdrawals. The Aircraft capital accounts of each of the Taylors were debited a considerable number of times from December 1943 through 1946 to reflect withdrawals made to pay their respective income taxes. The taxes of petitioner and Arthur exceeded those of Robert and Carol. Each received a distribution from Aircraft of $250 in 1944 and $1,000 in November of 1945. Robert also received about $1,000 in December 1943, and Carol received an additional $500 in 1945. A letter dated January 10, 1944, which was addressed to and signed by Carol, states in part: "* * * All withdrawals outside of allowable wages as provided for in the partnership agreement are to be charged equally to the accounts of the four partners even though they may not be equally distributed to the partners or other prospective members of the company. This keeps the status of each partner equal at all times. * * *" In February 1944, petitioner signed and cashed two checks drawn on Aircraft in the sum of $680. Although the withdrawal was for his personal use, the four capital accounts were each charged $170. Robert Taylor did not know the *213 amount of his share of Aircraft earnings, and did not expect to receive any money other than an amount necessary for his maintenance. The columns in the following table reflect (1) the amount of Aircraft and Airmetal earnings, including salary, distributable to the four Taylors under the terms of the partnership agreements; (2) their total withdrawals, including funds for the payment of taxes, up to November 1, 1946; (3) the undistributed earnings belonging to each on November 1, 1946, under the terms of the partnership agreements; and (4) the number of Formetal shares distributed to each on November 1, 1946: Interest in Undis-
Income per
Actual
tributed Income
Shares of
Agreements *
Withdrawals **
on 11-1-1946
Formetal
Petitioner
$101,823.37
$103,168.03
[1,344.66)
63
Arthur Taylor
97,623.36
72,101.05
25,522.31
62
Robert Taylor
83,423.28
39,562.52
43,860.76
25
Carol Sharp
83,423.28
38,540.30
44,882.98
25
*214 Petitioner's accountant, Vick, prepared all tax returns for Aircraft, Airmetal, and Engineering, and for the four Taylors until October 1945. Petitioner alone signed the returns for the partnerships, and he also signed the 1943 returns for Arthur, Robert, and Carol. In May, 1944, petitioner and Arthur Taylor filed gift tax returns listing the partnership interests in Aircraft conveyed to Robert and Carol Taylor. The donees' information returns filed with the gift tax returns, were signed by petitioner as "agent for" Robert and Carol Taylor. Deductions and additions to bad debt reserve were claimed by Aircraft in the amounts of $1,539.85 and $1,879.54 for 1943 and 1944, respectively. The deduction for 1943 was computed on the basis of five per cent of the accounts receivable on December 31, 1943; the rate used for 1944 was three per cent. No deductions were claimed for 1942 or 1945. Aircraft's entire business during the years 1943, 1944, and 1945 was from Government subcontracts, and a large proportion of these contracts came from Airmetal. The charge to Aircraft's reserve for 1944 was $25.02, for an overpayment to one Blanche Wade which was considered to be uncollectible. The amount *215 of the overpayment was only $20.87. The charge to reserve for 1945 was $4.86. During 1946 Aircraft made sales of equipment to Engineering in the amount of $111.33 on June 30, and to Chemwood Corporation of $2,247.20 on June 30 and November 30. Chemwood Corporation was a business owned by petitioner and T. K. Broome. On December 31, 1946, the closing balance of $3,389.51 in the reserve account was closed out and additional bad debts were recorded in the amount of $3,423.34, representing a total of $6,812.85 in accounts considered uncollectible in 1946. Among the accounts considered uncollectible in 1946 were the following: Chemwood Corporation
$2,821.02
Engineering
380.93
Consolidaire
684.22
Fucalow
50.00
Tepfer Appliance Co.
470.35
J. L. Kern
47.80
$4,454.32
The amounts of $1,539.85 and $1,879.54 were not reasonable additions to Aircraft's bad debt reserve on December 31, 1943, and December 31, 1944, respectively. Opinion The chief question to be decided is whether bona fide partnerships existed between petitioner and his father, Arthur, in Aircraft in 1942; between petitioner, Arthur, and petitioner's two eldest children, Robert and Carol, in *216 Aircraft in 1943, 1944, and 1945; between the four Taylors and John H. Tepfer in Airmetal in the year ending April 30, 1945; and between petitioner, Arthur, and Robert, in Engineering in the year ending June 30, 1945. In the event it is held that Robert and Carol were not partners in these enterprises, the proper allocation of taxable income between petitioner and Arthur also must be decided. The final question for decision is whether Aircraft properly deducted the amounts of $1,539.85 and $1,879.54 in 1943 and 1944, respectively, as additions to its bad debt reserve. Whether a partnership exists is essentially a question of fact. The issue is whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." . Respondent has determined that the other members of petitioner's family were not partners in any of the businesses, and has held that the entire income from the enterprises, other than Tepfer's interest in Airmetal, was taxable to petitioner. In computing the income of each partnership, respondent has allowed as a deduction the salary paid to Arthur *217 Taylor. Because of the different factual circumstances, the partnerships will be considered separately. Aircraft - 1942 Petitioner and Arthur Taylor formed the first Aircraft partnership in March 1942. Respondent's contention that Arthur Taylor was not a bona fide partner is based primarily on the reservation to petitioner in the partnership articles of the exclusive power to manage the enterprise and to draw checks. We agree that this circumstance militates against petitioner's contention, but it is only one factor indicative of the parties' intention, and not conclusive. We are persuaded by other factors to sustain petitioner's position. Although he was 72 years old in 1942, Arthur Taylor was a vigorous individual and enjoyed excellent health. He contributed part of Aircraft's original capital, and capital accounts were set up in Aircraft's books to reflect these contributions and his interest in the enterprise. He was an experienced machinist and had been in charge of tooling at the Taylorcraft Aviation Corporation, which manufactures airplanes. When Aircraft was formed, he supervised the installation of the production machinery, prepared drawings of machined parts and *218 cost estimates, and was in charge of operations until Aircraft had been turning out completed products for several months and was ready to move to new quarters. We hold that the first Aircraft partnership formed between petitioner and Arthur Taylor in March 1942, was a bona fide enterprise in which both petitioner and his father intended to join in good faith for the present conduct of a machine shop to produce war material. After Aircraft had been in existence for several months, the parties executed the agreement of August 29, 1942, which increased Arthur Taylor's distributive share of Aircraft's net income from 25 per cent to 50 per cent. It had developed that petitioner's absence from Alliance was required approximately four days of each week in connection with his activities for the Gibson Company and for the Government glider program. In addition, Arthur Taylor made a contribution to Aircraft of small tools. This change in the partnership agreement was made by the parties for a business purpose and reflected their judgment as to a proper division of Aircraft profits in the light of Arthur Taylor's activities on behalf of the enterprise and petitioner's frequent absence. The equal *219 division was not unreasonable and we believe it improper to reject the judgment of the partners. We hold that respondent erred in determining that Arthur Taylor was not an equal partner with petitioner in Aircraft's earnings in 1942. Aircraft 1943-1945 and Airmetal 1944-1945 The partnership agreement by which Robert Taylor and Carol Taylor Sharp, petitioner's two oldest children, were made equal partners in Aircraft was signed on November 1943, around Thanksgiving Day. Although petitioner claims that the four had orally agreed to operate Aircraft as an equal partnership on or about January 1, 1943, the evidence indicates and we have found, that no agreement existed on January 1, 1943, or at any time prior to November 1943. When R. R. Vick, Aircraft's accountant, prepared declarations of estimated tax reflecting distributive shares of Aircraft's net income for petitioner and Arthur in September 1943, he did not prepare declarations for Robert or Carol; the capital account for Carol was set up in her married name, although she was not married until July 26, 1943; Carol's married name is also used in the written assignment in which petitioner and Arthur conveyed parts of their interests *220 in Aircraft and in their capital accounts to Robert and Carol; and the fictitious name certificate for the new partnership was not executed until November 27, 1943. Petitioner also appears to contend that the interests in Aircraft and the capital accounts were conveyed to Robert and Carol pursuant to a 1942 agreement between the parties that the children would be made equal partners in 1943 if they worked without wages for Aircraft in 1942 and if Aircraft proved profitable. We have carefully considered the evidence and we do not find that any contract of this nature did exist. Carol testified that she assisted in Aircraft's work in 1942 because she desired to help her father; and she and Robert were paid wages by Aircraft in 1942. The gift tax returns filed by petitioner and Arthur also reflect adversely upon the contention that the parties were fulfilling a contractual obligation. Petitioner's position is that even if the assignment of interests in Aircraft to Robert and Carol constituted gifts, Robert and Carol thereafter owned an equal part of Aircraft and Aircraft's capital accounts, and, pursuant to the partnership agreement, each had an equal interest in Aircraft's earnings. *221 Similarly, petitioner contends that the withdrawals from Aircraft's capital accounts for the purposes of forming Airmetal constituted a contribution of capital by each, and, pursuant to the Airmetal articles of partnership with Tepfer, each owned a one-fifth interest in Airmetal and in Airmetal's earnings. In addition to the contributions to capital and the execution of partnership agreements, petitioner claims that Robert and Carol discussed Aircraft's and Airmetal's business problems with petitioner during visits and during the course of telephone conversations. Petitioner also contends that the intention to make Robert and Carol partners in these enterprises is further demonstrated by the circumstances that capital accounts were opened for the children in the books of Aircraft and Airmetal, and that both were given stock in the Formetal Corporation in 1946 when the assets of the two partnerships were conveyed to Formetal. The evidence establishes that at the time petitioner and Arthur executed the assignment of interests in Aircraft to Robert and Carol, the latter were away from Alliance, Ohio, and little likelihood existed that they could return before the war ended. Aircraft, *222 on the other hand, was established primarily to produce war material. Robert and Carol signed the partnership articles in Lafayette, Louisiana, during a visit to Robert by petitioner. Robert had entered the Air Force in February 1943, and except for several leaves, did not return to Alliance until September 1945. Carol had married Robert Sharp on July 10, 1943. Sharp also was in the Air Force and he and Carol lived together at Stanford, Kansas; Winfield, Kansas; Victoria, Texas; and Rantoul, Illinois. Both Robert and Carol Taylor returned to Alliance in September or October, 1945, and neither took any part in the management or operations of either enterprise. It also appears that the assignment of interests to Robert and Carol in Aircraft and the establishment of their partnership interests in Aircraft and Airmetal had no effect in the income-producing operations of the business. Aircraft produced three glider parts on subcontracts which were secured as a result of petitioner's connection with the Government's glider program, and when these contracts were terminated, Aircraft ceased operations. When Robert and Carol were taken into Aircraft in November, 1943, production was at or *223 near maximum. Airmetal was organized to produce only one article of war material, the chaff dispenser, under a prime contract which was obtained through the influence of Tepfer. Upon termination of this contract, Airmetal ceased operations. The circumstances that Robert and Carol could not and did not render services, or help manage, and that their status as partners had no effect on the business operations of the enterprises are factors indicating a lack of intention to truly join together in the present conduct of the businesses. Petitioner, however, places heavy emphasis on the fact that Robert and Carol contributed capital to Aircraft in 1943 and to Airmetal in 1944. A contribution of capital, even though acquired by gift, as was their Aircraft contribution, is of great weight in indicating an intent to join in the present conduct of a business. In discussing the contribution to capital of property received by gift, the Supreme Court, in the Culbertson case, stated: "* * * If the donee of property who then invests it in the family partnership exercises dominion over that property - and through that control influences the conduct *224 of the partnership and the disposition of its income - he may well be a true partner * * * In the Tower and Lusthaus cases we distinguished between active participation in the affairs of the business by a donee of a share in the partnership on the one hand and his passive acquiescence to the will of the donor on the other." We think the evidence amply illustrates that Robert and Carol were not intended to and did not exercise any dominion over the interests which petitioner and Arthur purportedly conveyed to them, that they never received the income earned by their supposed capital interests, and that the other partners acted in disregard of the rights which the supposed capital interests and the partnership agreements gave to Robert and Carol. As to the dominion of Robert and Carol over their partnership interests, it is true that the written assignment giving them interests in Aircraft appears absolute on its face. However, the property conveyed consisted not of a sum of money, but of an interest in the partnership itself and of a portion of the capital accounts of petitioner and Arthur, and the assignment was executed in conjunction with and in contemplation of the executed *225 of the partnership agreement. Accordingly, we read these two documents together. The partnership agreement places severe limitations on the interests of Robert and Carol which were not applicable to petitioner or Arthur: Robert and Carol could not transfer their interests without the consent of the other partners; they could not encumber their interests; in the event their interests were seized or attached by legal proceedings, the agreement provided that the interests would be forfeited to the other partners in return for the payment of the nominal sum of $1,000. In addition, Robert and Carol were required to surrender, for a nominal sum, part of their interests in Aircraft and in their capital accounts to each of their three brothers and sisters as the latter reached the age of 21. Unlike petitioner and Arthur, Robert and Carol were thus neither free to dispose of their interests nor to retain what they were supposedly given. Cf. , certiorari denied, . The same restrictions existed in the Airmetal agreement, although their supposed contribution to Airmetal's capital, as reflected by the withdrawals from their *226 Aircraft accounts, appeared absolute on its face. The evidence also establishes that Robert and Carol never received their purported shares of the earnings of Aircraft and Airmetal. Both partnership agreements prohibited distributions of income to any partner without the consent of all partners. Neither Robert nor Carol could write checks on either partnership, although Carol testified that she thought she did have such authority. Carol signed a letter in which she stated that it was proper for withdrawals to be charged equally against the capital accounts of all, although distributed unequally, and she testified that this was her understanding of the partnership. Robert Taylor testified that he expected to receive only an amount of money needed for his personal maintenance. As to the actual distribution of earnings, it appears that little was distributed by Aircraft to any of the partners, other than for the payment of taxes, and that the accumulated earnings were represented by the assets on hand when production ceased. The only personal distributions made by Aircraft were $250 in 1944, and $1,000 in 1945, to each of the Taylors; Robert also received $1,000 in 1943, and Carol received *227 an additional $500 in 1945. In addition, on at least one occasion in 1944, petitioner withdrew $680 for his personal use, although the withdrawal was charged equally against the capital accounts of the four Taylors. Airmetal made profits totaling $149,439.24 during the two years it existed. These profits were not credited equally to the accounts of the five partners: petitioner, Tepfer, and Arthur received unexplained special credits aggregating $76,000, and then withdrew these sums from the business; the evidence does not suggest that Robert and Carol were even aware of the withdrawal of more than half of Airmetal's earnings by the other three. The balance of Airmetal's earnings, or $73,439.24, was credited almost equally to the five capital accounts. No personal withdrawals were made from Airmetal by Robert and Carol at any time, and their supposed share of the $73,439.24 was represented by the assets on hand when Airmetal ceased operations. Both partnerships stopped production in the latter part of 1945 or early in 1946. Tepfer's interest in Airmetal was purchased on February 1, 1946, and all of Airmetal's assets were conveyed to the Formetal corporation by April 30, 1946, in *228 return for 215 shares of Formetal stock. Other than the unexplained $76,000 credited to and withdrawn by petitioner, Arthur Taylor, and Tepfer, no withdrawals had been made from Airmetal prior to April 30, 1946, except for the payment of taxes. The withdrawals of petitioner and Arthur Taylor for tax payments were larger than those for Robert and Carol. Accordingly, immediately prior to Airmetal's dissolution on April 30, 1946, the interests of Robert and Carol in Airmetal's undistributed earnings and only asset, the Formetal stock, considerably exceeded those of either petitioner or Arthur Taylor. Similarly, Aircraft had disposed of its inventory and depreciable assets during 1946, principally to Formetal. In exchange it received 61 shares of Formetal stock on June 1, 1946, 35 by virtue of an increase in the number of Formetal's outstanding shares from 215 to 250, and 26 in an unexplained transfer from the 215 held by Formetal. On November 1, 1946, Aircraft's assets consisted of the Formetal stock, cash, and receivables; the interests of Arthur, Robert, and Carol in Aircraft's undistributed profits and assets were approximately equal and considerably in excess of petitioner's. In *229 two transactions on June 1 and November 1, 1946, the shares held by Airmetal and Aircraft were distributed among the Taylor family without regard to the purported interests in the undistributed profits which they represented. Petitioner received 63 shares and Arthur Taylor 62 shares, a total of 125 shares, or 50 per cent of the outstanding shares. Each of petitioner's five children, including Robert and Carol, were given 25 shares each, although the other three, Thelma, Bonnie, and Bruce, had no interest whatsoever in the undistributed earnings of either Aircraft or Airmetal. Our findings of fact indicate that if the Airmetal and Aircraft partnership agreements had been honored, the shares of undistributed income of the two businesses were such that Robert and Carol each would have received in excess of 95 Formetal shares and petitioner would have received none. Petitioner offered no explanation as to why he and Arthur Taylor received a greater proportion of Formetal stock than was due them for their respective interests in Aircraft and Airmetal; even more important, the record does not suggest why Robert and Carol each received only 10 per cent of Formetal's stock, although their *230 combined interests in the undistributed earnings of each of the partnerships exceeded 80 per cent. Airmetal's capital accounts were closed on April 30, 1946, and the distribution of its Formetal stock left it without any other assets. Aircraft, on the other hand, had cash and receivables on December 31, 1946, of $22,221.06, and a net worth of $19,231.95. The capital account credit balances of Arthur, Robert, and Carol ranged from $6,300 to $7,700; petitioner's account contained a debit balance of $1,300. The evidence does not contain any information concerning the distribution of Aircraft's remaining assets, and petitioner does not assert that they were distributed in any way as to satisfy the claims of the other Taylors to their shares of Aircraft's remaining undistributed earnings. We think that this conduct of the parties amply demonstrates that there was no intention to give Robert and Carol ownership and dominion over any interest in the capital or earnings of either partnership, or to be bound by the partnership provisions concerning their interests. We have considered Robert's and Carol's lack of real ownership of any capital interest in the partnership, and other factors, *231 including the disregard of the terms of the agreements, the improbability obvious when the partnerships were formed that Robert and Carol could render services or assist in management, and the failure of Robert and Carol to obtain their purported share of the accumulated earnings. We conclude and have found that there was no intention on the part of petitioner, Arthur Taylor, and also Tepfer, in the case of Airmetal, to join in good faith with Robert and Carol in the present conduct of the two enterprises. We hold that respondent correctly determined that Robert and Carol were not partners in Aircraft in 1943, 1944, and 1945, or in Airmetal in the year ending April 30, 1945. We further hold, however, that the respondent erred in determining that Arthur Taylor was not a partner in these enterprises. He continued to render services throughout the years in question; he was authorized to and did sign checks; he participated with petitioner and Tepfer in the withdrawal of the $76,000 from Airmetal; he could transfer his interest in the partnership without unanimous written consent; and he received Formetal stock approximately equal to his interest in the partnerships' assets and undistributed *232 earnings. A further question necessary for decision is the determination of the respective interests of petitioner and Arthur Taylor in the income of the Aircraft partnership formed in 1943, and in Airmetal. Prior to the 1943 agreement, the existing agreement between the two gave petitioner a 75 per cent interest "in the said business" of Aircraft, but only a 50 per cent interest in earnings. Petitioner's contention is that the equality of interest in Aircraft's earnings existing prior to the attempt to make Robert and Carol partners must be preserved. Respondent's position is that the purported 25 per cent interests of both Robert and Carol must be taxable to the petitioner alone because they received their interests in Aircraft from petitioner and because the agreement of 1943 superseded the prior agreements between petitioner and Arthur Taylor and evidenced an intent that Arthur Taylor should receive only 25 per cent of the Aircraft income. We agree with petitioner. The 1943 agreement with Robert and Carol fixes petitioner's share of the earnings at 25 per cent as clearly as it does Arthur Taylor's. The credit balances set up in the capital accounts of Robert and Carol represented *233 transfers from the accounts of both Arthur Taylor and petitioner, and the purported shares of earnings given to Robert and Carol were taken equally from Arthur and petitioner. There is nothing in the evidence to suggest that petitioner and Arthur Taylor did not intend to preserve their existing relationship in Aircraft in the event their attempt to give Robert and Carol the status of partners failed. We think the same reasoning applies to Airmetal. The petitioner and Arthur contributed equally to Airmetal's initial capital and the purported contributions of Robert and Carol were taken from the undistributed profits of Aircraft in which petitioner and Arthur had an equal share. We accordingly hold that petitioner is taxable on only one-half of the Aircraft and Airmetal distributive income previously credited to Robert and Carol. Engineering The evidence concerning the third partnership, Engineering, is less illuminating, inasmuch as no books or records for its operations were introduced in evidence. The partnership articles were signed by petitioner, Arthur, and Robert on or about July 1, 1944. Robert, of course, was in service and away from Alliance. The initial capital was provided *234 by withdrawing $1,500 from Aircraft and charging the capital accounts of each. However we have held that Robert was not a partner in Aircraft. Accordingly, these funds represented withdrawals from petitioner's and Arthur's interests in Aircraft. Engineering's business was that of rendering engineering and accounting services, and during the years in question, the only enterprises to which it rendered such services were Aircraft and Airmetal; although not clear, the evidence suggests that Engineering was merely a consolidation of the personnel and functions of the office and technical staffs of Aircraft and Airmetal during the years in question. Petitioner and Arthur Taylor performed services for Engineering. Robert remained in the Air Force until about September, 1945, when he returned to Alliance. He testified that he worked as an engineer for Engineering. However, this testimony probably did not refer to the years in question, for he returned to school at the Case Institute shortly after his separation from service and did not receive his degree until 1947. Furthermore, Engineering's returns for the years ending June 30, 1945 and 1946, list him as "Army" and "Student" and report *235 that he devoted no part of his time to Engineering's business; during this period he received no salary from Engineering. We conclude that Robert did not contribute services to or assist in the management of Engineering. There is also no evidence that he even received anyd distribution of earnings from Engineering or any part of the assets when the enterprise dissolved. We hold that petitioner has failed to establish that there was any intention to have Robert join in the conduct of Engineering's business during the years in question. For the reasons previously discussed, however, we think that petitioner should be taxable on no more than 50 per cent of the Engineering income credited to Robert Taylor. Respondent disallowed the sums of $1,539.85 and $1,879.54 which were deducted in 1943 and 1944, respectively, as additions to Aircraft's reserve for bad debts. Respondent's position is that these deductions constituted unreasonable additions to Aircraft's reserve. The evidence shows that the additions represent five per cent of receivables outstanding on December 31, 1943, and three per cent of receivables outstanding on December 31, 1944. Petitioner's accountant, Vick, who determined *236 the amount of the deductions, testified that the additions appeared reasonable at the time, although in retrospect, an addition based on three per cent would have been reasonable for 1943. Whether an addition to a bad debt reserve is reasonable depends on a variety of factors existing at the time the estimate is made, such as the nature of the taxpayer's business, general business conditions, the taxpayer's past experience in collecting accounts, and the size of the existing reserve. See , affd. ; . Aircraft's entire business in 1943, 1944, and 1945 was from Government subcontracts, a large part of the subcontracts came from Airmetal, which held a prime Government contract. Although Vick testified that Aircraft experienced difficulty collecting some accounts, there were in fact no uncollectible accounts in 1942, or 1943, and the accounts recorded as uncollectible in 1944 and 1945 amounted to only $25.02 and $4.86, respectively. The item of $25.02 was recorded to reflect a purported uncollectible overpayment by check to a Blanche Wade, only $20.87 of which actually *237 was an overpayment. The evidence did not identify the nature of the $4.86 charge-off in 1945. In 1946, Aircraft claimed to have incurred bad debts in the amount of $6,812.85. It appears, however, that at least $3,201.95 of this amout represented receivables from Engineering and from Chemwood Corporation, a business owned by petitioner and T. K. Broome, and that the principal part of these obligations arose from the purchase of Aircraft's machinery and equipment in 1946, and not from operations in prior years. We have considered the various economic factors existing on December 31, 1943, and conclude that respondent properly disallowed the deduction. Aircraft had not experienced a single bad debt in its two years of operations. We also conclude that the deduction for 1944 should be disallowed, since no evidence appears that any change had occurred with respect to the soundness of Aircraft's accounts. The only bad debt allegedly incurred in 1944 amounted to only $20.87 and arose out of a transaction with a person who obviously was not a normal commercial debtor of Aircraft's. In the recomputations, allowance shall be given to the item of $20.87 which petitioner has established as a *238 bad debt incurred in 1944. Decisions will be entered under Rule 50. Footnotes
*. The distributive share of earnings includes salaries of $4,800 each payable to petitioner and Arthur under the Airmetal agreement and salaries of $13,600.08 and $9,400.08, respectively, actually paid to them by Aircraft. Adjustment is also made for the salary of $4,400 payable to Tepfer (for 22 months) by Airmetal and Tepfer's share of Airmetal's earnings. Each Taylor's distributive share also includes the sum of $7,051.64 ($7,051.65 for petitioner) which was unexplainedly credited to each of their Airmetal capital accounts after Tepfer's interest was bought out. ↩
**. The distributions include the salaries actually paid to petitioner and Arthur Taylor by Aircraft.↩